JOHN W. PALMER, *et al.*, V. JOHN L. WADDELL.

1. A NATURAL WATER-COURSE, *Instanced.* Where surface-water having no definite source is supplied from falling rains and the melting snow from a hilly region or high bluffs, and owing to the natural formation of the surface of the ground is forced to seek an outlet through a gorge or ravine, and by its flow assumes a definite or natural channel, and escapes through such channel regularly during the spring months of every year, and in seasons of heavy rains, and such has always been the case so far as the memory of man runs, *held,* that such accustomed channel through which the waters flow may fairly be said to possess the attributes of a natural water-course.

2. OBSTRUCTION OF WATER-COURSE; *Damages.* The owner of land through which such a water-course runs cannot, by obstructing its channel, turn the flow of the water upon adjacent lands, to their injury and damage.

3. JOINDER OF PLAINTIFFS; *Practice.* Where two or more persons have separate causes of action against the same defendant, arising from the obstruction of a natural water-course, and the injury of their lands and crops thereby, they cannot unite in the same petition to recover damages for such injuries which are plainly distinct and unconnected.

4. NUISANCE; *Action for Abatement.* Two or more persons having separate and distinct tracts of land, which are injured or rendered less valuable by the overflow of water at certain seasons of the year from a natural water-course obstructed by ditches and dams, where such overflow is a common injury to the lands of both, may join in a suit as plaintiffs to restrain such nuisance, as such parties have a common interest in the subject-matter thereof.

*Error from Atchison District Court.*

AT the November Term, 1877, of the district court, *Waddell*, as defendant, recovered judgment against *John W. Palmer*, *John Palmer*, and *James W. Palmer*, as plaintiffs, in an action by them brought against *Waddell* to recover damages for unlawfully digging ditches and erecting and maintaining certain dams and obstructions in a certain water-course, whereby the water was turned away from defendant's lands, and upon the lands of the said *Palmers.* The plaintiffs bring the case here. The facts appear in the opinion.

*Manley & Tufts,* and *W. S. Greenlee,* for plaintiffs in error.
*Everest & Waggener,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: On July 10th, 1876, plaintiffs in error filed their petition in the district court of Atchison county, claiming damages of the defendant in error for unlawfully digging ditches and erecting and maintaining certain dams and obstructions in a certain channel and natural water-course, whereby the water was turned off the land of the defendant, and over the lands of the plaintiffs. The plaintiffs asked judgment in the sum of $2,000 for damages caused by acts of defendant, and further prayed an abatement of the nuisance, and an injunction to prevent further damages. The defendant's answer was a general denial. At the November term of court, 1877, the cause came on for hearing before a jury. After the plaintiffs had introduced their evidence, the defendant interposed his demurrer thereto. This was sustained, and the jury discharged. The plaintiffs now bring the case here on error for review.

Counsel for defendant claim the demurrer was rightfully sustained, for two reasons: *First*, They allege the evidence wholly failed to establish any natural water-course where the obstructions were erected, and only showed the defendant protected his premises by ditches and dams from surface-water, which they insist he had the right to keep off his own lands. *Second*, That plaintiffs were not entitled to recover, because they allege the proof established that the plaintiffs had no joint interests in the tracts of land named in the petition, or the possession or occupancy thereof, or the emblements thereon.

The testimony upon the question concerning whether there was a natural water-course upon the premises of defendant, was as follows—one witness testifying:

"I knew of a stream of water flowing from the bluff into Waddell's land, and out of the western boundary. The source is a mile above the fence. Water don't flow all seasons through it. At its source it flows all the year, but lower down it does not. It runs all the year, except during August. The course of the water could always be traced. Previous to

the dam, the water went down through Waddell's farm into the old creek-bed; this bed flowed into Palmer's and back into Waddell's. There was a regular channel to the old creek when I first knew it, in 1859."

Another said:

"Have known Waddell's land since 1854. I moved near Oak mills in the fall of 1854. I knew the stream spoken of; it is the natural outlet of the water that flows on about a section of land. It is a little over a mile from its source to where it was dammed up by Mr. Waddell, near Oak mills. There was a ditch running square across Waddell's field before the dam was made. Before the ditch was made the water ran down to the bottom, and when it got to the bottom it spread, and as it flowed, it went out to the creek-bed and flowed across Waddell's place. It ran from the creek-bed down the bottom, and then into the Missouri river. I have known it was accustomed to run in this way since 1855 and 1856."

On cross-examination this witness said:

"Whenever it rained, more water flowed down over Waddell's lands than any other time. The flowing of the water generally occurred in the spring of the year. The water that flows from the upper country and runs down there, is the water that flows during the heavy falls of rain. The ravine drains the upper country. There are some springs up the hollow — three, I believe. The water flows about 100 to 200 yards from these springs — that is, in an ordinary dry time it runs from 100 to 200 yards from the springs; in rainy seasons the water runs three months down to Waddell's farm."

Another testified that —

"The obstruction was placed over what is called a branch. I have known it twelve or fifteen years. It is a mile or a mile and a quarter long, and drains 300 or 400 acres. The branch is fed by the rains that fall."

On cross-examination, this witness said:

"The water flows from above, and the falling of rain. There are some springs. The water only flowed on the Waddell land after the falling of rain; it was only surface-water."

One of the plaintiffs testified as follows:

"The stream runs in an easterly direction. From the dam to the head of it, it was a mile or over. Water had been running there since 1859. The water came down out of the

hollow above Oak mills. The stream had banks from a foot up to five feet high; it was five or six feet wide in some places — some places, ten to twelve feet wide. Part of the stream runs the year round, part does not. The stream is fed by springs. Before the erection of the dams, the water ran right across Waddell's land to the creek-bed, and went round down the creek-bed towards Kickapoo. In 1875, the water came all the way down in the months of March, April and May. In 1876, the water flowed from the first of March until sometime in July. That season was wetter than 1875."

Other witnesses gave similar testimony.

Upon this evidence the case should have been submitted to the jury. Within the rule adopted in *Earl v. De Hort*, 1 Beas. (N. J.) 280, the channel to the old creek-bed, from whence the waters flowing therein reached the Missouri river, is a natural water-course — at least, such an accustomed channel through which the water has flowed from time immemorial may fairly be said to possess the attributes of a natural water-course so far as to forbid the diversion, repulsion, or altered transmission of the water, to the injury and damage of adjacent fields and lands.

1. A natural water-course, instanced.

In the case, *supra*, it was held that the question whether an outlet for water is a water-course, does not depend upon the quantity of water it discharges. If the face of the country is such as necessarily collects in one body so large a quantity of water, after heavy rains or melting snows, as to require an outlet to some common reservoir, and if such water is regularly discharged through a well-defined channel which the force of the water has made for itself, and which is the accustomed channel through which it flows and has flowed from time immemorial, such channel is a natural water-course. The evidence in this case clearly tended to show that in times of heavy rains and in the spring seasons of every year, as far as the memory of man runs, the surface of the ground, back a mile and over from the Missouri river, is such as to collect the water falling on a large section of country to such an extent as requires an outlet to the river through the bottom or low lands at the foot of the bluffs, and

that the flow of the water had produced a definite or natural · channel through the land of defendant and of other persons where such accumulated surplus water had been always accustomed to run. With this view, this water-course could not be obstructed rightfully to the injury of other lands, or the waters running thereon turned upon them to their damage; and the action of Waddell, if it had this effect, was wrongful. The adoption of this rule seems most reasonable, and to be dictated by sound public policy. When Waddell purchased his land, he had knowledge of this channel, and the condition of the surface of the surrounding country which caused the collection of the surface-water to seek an outlet through it. He obtained the land burdened with the servitude of having such waters pass over it in their natural flow, and it would be very unjust to adjacent land proprietors to allow him to transfer such burden of servitude upon them. Again, if Waddell had the right to erect dams a few feet in height across the channel, he could have carried his dams to almost any degree upward he might choose, and thus to improve and reclaim a few acres of land of his own, he would have the power to destroy a much larger acreage of land for any agricultural or other useful purpose. Such an improvement and amelioration of one's own property, at the expense or to the detriment of another, is opposed to every maxim of law and every sentiment of justice. (*Bellows v. Sackett*, 15 Barb. 96.) The question whether any portion of the water flowing through the channel on Waddell's land is carried down from the several springs located in the ravine above, is not very material.

This branch or channel assimilates very closely to many streams in the state, which, having a definite source, flow their entire length only a very small portion of the year; but at times, supplied by falling rains and melting snow, the volume of water is greatly increased, and its force and fury become almost irresistible. No one will contend that such streams can be obstructed, to the injury of adjacent lands. Neither can this one.

2. Obstruction of water-course; damages.

We may remark in passing, that many of the authorities introduced by counsel for defendant have scarcely any application, as they treat solely of mere surface-water, and not of the flow of water from hilly regions and high lands through definite channels in ravines or gorges. The strongest authority presented by them is *Hoyt v. The City of Hudson*, 27 Wis. 656; and yet the chief justice, in that case, quotes approvingly the observations of the court in *Bowlsby v. Speer*, 2 Vroom, 351, that the general rule applicable to surface-water does not apply in cases in which in a hilly region, from the natural formation of the surface of the ground, large quantities of water, in times of excessive rains or from the melting of heavy snows, are forced to seek a channel through gorges or narrow valleys.

We do not think the second reason given for sustaining the demurrer a good one, because the testimony shows, and counsel admit in their brief, that the crops injured (at least the wheat) were owned jointly by all the plaintiffs. To a large portion of the property damaged, there is no common or joint interest between the plaintiffs, and for the damages 3. Joinder of plaintiffs; practice. to such property no recovery can be had. This applies to the lands, and to all such personal property as plaintiffs have no joint or common interest in. They cannot recover in one action pecuniary damages for their separate rights, which the testimony discloses are several and distinct. (*Hudson v. Commissioners*, 12 Kas. 140; *Swenson v. Plow Co.*, 14 Kas. 387; *Schultz v. Winter*, 7 Nev. 130.)

Under the third cause of action, however, the court ought to have retained the case. This part of the petition is exclusively for equitable relief, and is supplemented 4. Nuisance; action for abatement. in the prayer by a demand simply for an injunction to restrain the defendant from committing and maintaining a nuisance, and for its abatement. The common interest which the plaintiffs have in suppressing the nuisance, as shown by the testimony under the petition, warrants the plaintiffs in uniting in the suit. The common in-

terest of the parties is in the subject-matter of the action, and not merely in the legal questions involved, as in *Hudson v. Commissioners*, supra.

In the case of *Reid v. Gifford*, Hopk. 416, where several proprietors of different lands and mills, and of separate parts of the natural water-course at the outlet of a lake, sought to restrain a nuisance, caused by an artificial channel cut by the defendant upon his own land, the effect of which was to draw off the water of the lake, it was decided that as the acts of the defendant complained of were a common injury to all the complainants, there was such a common interest in the subject of the suit as to authorize them to join in one bill. (*Blunt v. Hay*, 1 Barb. Ch. 59; *Blunt v. Hay*, 4 Sandf. Ch. 362.)

The code declares, that when the question is one of common or general interest to many persons, or where the parties are numerous and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all. (Code, § 38.) This provision, with the ones immediately preceding, substantially reënacts the old equity rules on the subject of parties, and where one general right is claimed, and where there is one common interest among all the plaintiffs in the subject of the suit, the objection to improper parties cannot be maintained. (11 Barb. 516; *Tate v. Railroad Company*, 10 Ind. 174; Pomeroy on Remedies, § 269, p. 317; *Peck v. Elder*, 3 Sandf. 126; *Foot v. Bronson*, 4 Lans. 47; *Brady v. Weeks*, 3 Barb. 157.) See, also, under the statute of the state relating to torts, *Bridge Company v. Wyandotte*, 10 Kas. 326; *Gilmore v. Norton*, 10 Kas. 491; *Gilmore v. Fox*, 10 Kas. 509.

If the main purpose of the plaintiffs is to recover damages for the injuries to their lands, crops and property, it would be better to amend the petition before another trial, and unite as plaintiffs only those who have a joint or common interest in the property damaged. On the other hand, if they rely wholly upon their claim for equitable relief, such portions of the petition as have no connection therewith should be eliminated; and it would be more satisfactory pleading to state clearly and distinctly the title or interests of each plaintiff

in the separate tracts of land.  Under the facts disclosed upon the trial, the petition was badly drawn.  Except for the joint ownership of the wheat crop and the claim to restrain and abate an alleged nuisance, common to all, the action of the trial court would have been affirmed.

The judgment of the district court will be reversed, and a new trial granted.

BREWER, J., concurring.

VALENTINE, J.: I concur in reversing the judgment in this case, but upon some of the propositions stated in the foregoing opinion of the Chief Justice, I do not wish to express any opinion.