The Kansas City & Emporia Railroad Company
v. Joseph Riley.

Surface-Water; *Law of Kansas.* The doctrine of the common law with respect to the obstruction and flow of mere surface-water prevails, as a general rule, in this state. (*Railroad Co. v. Hammer*, 22 Kas. 763; *Gibbs v. Williams*, 25 id. 214.) This rule has some exceptions, and one is noticed by this court in *Palmer v. Waddell*, 22 Kas. 352. *Held, however,* That upon the facts disclosed upon the trial, this case is not within the exception therein noticed.

*Error from Lyon District Court.*

Action by *Joseph Riley* against *The Kansas City & Emporia Railroad Company*, brought July 17, 1883, to recover $300, as damages for the obstruction of an alleged watercourse by reason of the construction of an embankment upon the right-

of-way of the railroad company, and upon which its railroad was built. Trial at the September Term, 1883, before the court and a jury. The jury returned a verdict for the plaintiff, and assessed his damages at the sum of $85, and also returned the following findings of fact:

"1. Was not the Atchison, Topeka & Santa Fé road completed from Topeka to Emporia in July, 1880? A. Yes.

"2. Did not the plaintiff first go upon his premises when he got his deed, April 20, 1872? A. Yes.

"3. Is not the amount of land drained over plaintiff's lot 35 acres? If not, how many acres? A. Between 35 and 40 acres.

"4. Does or did any water flow or run over plaintiff's land except that which fell from the clouds in shape of snow or rain, on about 35 acres? A. None, except back-flow caused by insufficiency of defendant's ditch on north side of defendant's right-of-way.

"5. Is it not about 12 rods from defendant's south line to the embankment, mentioned in plaintiff's petition, and if not, how far is it? A. Yes.

"6. Are there hills around plaintiff's land, or any springs, or living or running water in it? A. Slight hills, but no living or running water.

"7. Are there any gorges or ravines in plaintiff's land? If so, on which part thereof, and what are their lengths and depths? A. No.

"8. Would water back into plaintiff's land except in case of exceedingly heavy rains? A. Yes, with melting snows.

"9. How much of plaintiff's land would be likely to overflow, and how many times a year? A. Do not know.

"10. How long would such overflow be likely to last each time? A. Do not know.

"11. Is there any well-defined water channel on plaintiff's land, aside from the ditch he dug four years ago, cut and worn by the flow of water? A. Yes.

"12. If you answer the above question No. 11 in the affirmative, state where it is, and its length, its breadth, and the height of its bank. A. Through entire premises, about thirty feet wide; no abrupt banks.

"13. If you find that the defendant has damaged the plaintiff, state in what the damage consists; state fully. A. By overflowing his land.

"14. Do you find any more of a watercourse on plaintiff's

land than what is to be seen on most of the farms in Kansas? A. No."

After the plaintiff had introduced all his evidence, the railroad company interposed and filed its demurrer thereto, upon the ground that no cause of action was proved. Demurrer overruled. After the jury returned their verdict and special findings, the company filed its motion for a new trial, upon the ground that the verdict was contrary to the evidence; that the verdict was not sustained by the evidence; that the verdict was contrary to law, and for errors in law occurring on the trial, which were duly excepted to by the railroad company. This motion was overruled by the court, and judgment entered in favor of the plaintiff upon the verdict. *The Railroad Company* excepted, and brings the case here.

*A. A. Hurd, C. N. Sterry*, and *Robert Dunlap*, for plaintiff in error; *Geo. W. McCrary*, general counsel.

*Peyton, Sanders & Peyton*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action to recover damages resulting from obstructing the flow of surface-water from its alleged natural course. The vital question in the case is whether, under the evidence, the plaintiff below was entitled to recover damages. We think not. The common law, as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people, is in force in this state in aid of the general statutes. Therefore the doctrine of the common law, with respect to the obstruction and flow of mere surface-water, prevails as a general rule. Under this rule, surface-water is within the control of the owner of any land upon which it falls, or over which it flows; he may use all that comes upon his own, or decline to receive any that falls on his neighbor's land. (*Railroad Company v. Hammer*, 22 Kas. 763; *Gibbs v. Williams*, 25 id. 214.)

"The simple fact that the owner of one tract of land raises

an embankment upon it which prevents the surface-water fall-
ing and running upon the land of an adjoining owner from
running off said land, and causes it to accumulate thereon to
its damage, gives to the latter no cause of action against the
former." (*Railroad Co. v. Hammer*, supra.)

In *Palmer v. Waddell*, 22 Kas. 352, the general rule ap-
plicable to surface-water was held not to apply in an excep-
tional case. This exception was favorably referred to in
*Bowlsby v. Speer*, 2 Vroom, 351, and *Hoyt v. City of Hudson*,
27 Wis. 656. The doctrine of the common law with respect
to the obstruction and flow of mere surface-water is not only
in force in England, but in Connecticut, Indiana, Massachu-
setts, Missouri, New Jersey, New Hampshire, New York,
Vermont, and Wisconsin. In a late case decided in Missouri,
it was said:

"We feel constrained to recognize the common-law doctrine
on this subject, so often and repeatedly approved by this court
without division in all its earlier and later decisions, as still
the law in this state. The rule of the common law as ex-
pounded in the numerous decisions quoted above, we think,
after all, best promotes and conserves the varied and import-
ant interests of both the public and private individuals inci-
dent to and growing out of this question. It permits and
encourages public and private improvements, and at the same
time restrains those engaged in such enterprises from unnec-
essarily or carelessly injuring another. . . . A strict and
literal application of the doctrine of the civil law would, we
think, in many places and in large districts of country,
materially retard, if not utterly destroy, many useful and
profitable improvements, pursuits and enterprises besides rail-
roading." (*Abbott v. Railroad Co.*, S. C. of Mo., Oct. 1884,
MS. See also *Lessard v. Stram*, 20 Cent. L. J. 231; *Barkley
v. Wilcox*, 86 N. Y. 140 — 24 Albany L. J. 453, 454.)

The rule of the civil law seems to be in force in Pennsyl-
vania, Iowa, Illinois, California, Louisiana, and is referred to
with approval in Ohio. In Pennsylvania, however, the civil
law does not seem to apply to house lots in towns and cities.
(*Bentz v. Armstrong*, 8 Watts & S. 40.) And in *Livingston v.*

*McDonald*, 21 Iowa, 160, the court, in an opinion by Dillon, J., after stating the civil-law doctrine, say that —

"It may be doubted whether it will be adopted by the common-law courts of this country so far as to preclude the lower owner from making in good faith improvements which would have the effect to prevent the water of the upper estate from flowing or passing away."

We do not think that the evidence before the trial court brings the case within the exception noted in *Palmer v. Waddell*, supra. It is apparent to us that the facts in the case of *Gibbs v. Williams*, 25 Kas. 215, are more nearly similar to those testified to on the trial, than disclosed in the record of *Palmer v. Waddell*. Plaintiff below owned and occupied lot 10 in Williams's addition to Emporia, consisting of about an acre of land. He had lived upon it with his family fifteen years. Upon the lot he had a small house, stable, chicken-pen, hog-pen, and cave; also, apple trees, cherry trees, peach trees, pear trees, grape vines, etc. There was no hilly region or high bluffs around the lot. The land near by was rolling prairie. Through the lot in question there was a depression through which surface-water from adjacent land found its way. Some of the witnesses called the depression a "draw," others a "ravine," and again others a "hollow — a drain." The jury found that there was no gorge or ravine in the plaintiff's land, and while in one finding they said that "there was a well-defined water channel cut and worn by the flow of water," this is fully explained in another finding, in which they said "that the channel was through the entire premises about thirty feet wide, with no abrupt banks," and the "watercourse no more than is to be seen on most of the farms in Kansas." There was no living or running water through the depression. The water flowing through or over the lot was a temporary accumulation of rainfalls, or caused from melting snow. The depression testified to by some as a channel or watercourse, was simply a passage-way for surface-water. Where the land was not actually cultivated, grass and weeds, in summer, grew in the

so called watercourse. Doubtless, any one looking might at times perceive that there was a passage-way over the lot for surface-water. The amount of land drained over the plaintiff's lot was between thirty-five and forty acres only, and there was no such watercourse, with banks and channels, as testified to in *Palmer v. Waddell.* Plaintiff upon the trial testified concerning the flow of water over his land, among other things, as follows:

"Q. You can state whether any water flows on the land, or not. A. I have seen water on it.

"Q. Where does that come from? A. It comes from Mr. McMillan's; it does, when we have a pretty heavy shower of rain; it comes in the slough, down right through my house lot.

"Q. Where does it go? A. It goes right out of my lot, down through that culvert; takes a straight shoot through that culvert right by my house, down the ravine.

"Q. Did you ever notice any channel above your place, between you and McMillan's where this water may have run? A. Well, not particularly. There is a little channel at the corner of my lot where the water emptied right into the drain from Mr. McMillan's, run down into my house lot, and some place, about three or four feet long, may be about a foot wide; just a small hole where the water jumps off, and if the ground is soft it makes a pretty good hole there; if the ground is solid it is not so apt to wash out.

. . . . . . . . . . . .

"Q. Well, where the water runs across you, the ground is not so high as it is at the east and west side? A. The lowest part is in my lot.

"Q. There is where the water goes? A. There is where the water goes through, and that is the lowest part; the water runs on the lowest part.

"Q. You raised corn on your lot this year, didn't you? A. No, sir, I planted some and the water washed it up; I planted corn and potatoes.

"Q. Would the water wash it up that came down from McMillan's, when it rained? A. Yes, sir.

"Q. The railroad water did not wash it up? A. No, the railroad water backed up on it before it was washed out by any water at all.

"Q. Are there any springs on your place? A. No, sir, there are no springs.

"Q. Are there springs on any of Williams's addition that you know of? A. Not that I know of.

"Q. There are no hills on it? A. No, sir, there are no hills at all.

"Q. No bluffs on it? A. No, sir, none at all.

"Q. What is there that you call a ravine? A. What I call a ravine is a place that water always runs in when it is high. You know water don't run on level ground — where it is dead level. What I call a ravine is where in heavy rains it has a fall, a slant, to take the water off to run somewhere. If it ain't, it won't run.

"Q. But there is no place where the water has dug a hole out, is there? A. I saw just one little place above me, and that is all. Two places, I believe.

"Q. You dug a ditch north of your stable? A. I dug a ditch on my acre; yes, sir.

"Q. How long ago did you dig that? A. I guess I dug it about four years ago.

"Q. That is the only ditch on your place? A. That is the ditch that is on my place."

There was other evidence in the case more favorable to plaintiff than this testimony, but we quote this much to show that the so-called well-defined channel, with its deep banks, alleged to have been upon the premises of plaintiff, was not easily seen or described by him.

To sustain the instruction of the court below concerning the obstruction and flow of mere surface-water, and to permit the plaintiff to recover upon the evidence in the record, would extend the case of *Palmer v. Waddell.* That is an extreme case, and is limited to surface-water from hilly regions or high bluffs, draining considerable tracts of land through a gorge or ravine, for such a flow as to make a definite or natural channel. The cases of *Gibbs v. Williams,* supra, and *Railroad Co. v. Hammer,* supra, decided subsequently to *Palmer v. Waddell,* show that the terms of that decision were never intended to be broadened.

This disposes of the case, because the demurrer to the evi-

dence should have been sustained. The judgment of the district court will be reversed, and the cause remanded for further proceedings, in accordance with the views herein expressed.

All the Justices concurring.