Summers, J.
Bean creek, or Tiffin river, rises in Devil’s lake, in Michigan, about forty miles north of the boundary line between that state and the state of Ohio. It flows southward across the northwestern part of Fulton county and empties into the Maumee river at Defiance, in Defiance county. It is the drain provided by nature for about five townships of Fulton county, or about ninety square miles of *155 land. .On petition praying for locating, establishing and constructing a ditch, drain or watercourse, proceedings were had resulting in the commissioners of Fulton county ordering the construction of improvements known as Bean Creek Improvement and Chesterfield Ditch No. 2, said Chesterfield Ditch No. 2 being described as branch No. 1. of said Bean Creek Improvement. Bean Creek Improvement is about eleven miles in length and Chesterfield Ditch No. 2 is about nine miles in length. The whole improvement cost about $37,000.00, and about fifteen hundred farms were assessed.
In the court of common pleas a suit was brought by plaintiff in error, John R. Mason, in his own behalf and on behalf of about three hundred and twenty others, named, who were assessed for about one-tenth of the cost of the improvement, and each of whom it is averred, stands in the same relation and class with plaintiff in the matters and things, complained of, each of whom makes the same complaint and is entitled to, and demands the same relief to which plaintiff is entitled, to enjoin the commissioners from assessing upon them any part of the cost of locating or constructing said improvement. The defendants answered, and upon trial in the court of common pleas that court granted an injunction as to all of said plaintiffs excepting eleven. The case was appealed to the circuit court, and in that court at the close of plaintiff’s evidence the case was dismissed.
Bean creek where it enters Fulton county is a living stream about one hundred feet in width, with a normal depth of water of about eighteen inches. Not far south from the state line, the stream spreads out forming a marsh, covering about *156 four thousand acres of land. In 1884 Bean creek was dredged and straightened through the marsh so that much of the land was tillable. Back from the creek and from the marsh are uplands, that a-re rolling and hilly, and which are drained by natural streams and watercourses that empty into the marsh and into the creek. These uplands are from ten to eighty feet above the level of the creek and the streams have a large fall and are swift flowing, so that they furnish natural and ample outlet for the drainage of the uplands. Some of the farms assessed for this improvement are distant ten or eleven miles from Bean creek, and no improvement of some of the streams or watercourses has been made. This improvement was petitioned for by the owners of land in the marsh or lowlands to further reclaim the marsh lands, or for relief from the overflow from the uplands, and the plaintiffs are owners of the uplands.
The lands of the plaintiffs were assessed upon the theory that all the lands in the water-shed should be assessed for the cost of the improvement of the outlet, irrespective of benefits. The surveyor who made the apportionment testifies, (Record 154). “Q. Did you fail to assess any lands which cast their waters into this creek? A. ' I think not; if I did, it was a mistake. Q. Is that the natural water-shed of Bean creek? A. Yes, sir. We intend to assess all this, land flowing into Bean creek.” (Record 162.) “Q. Taking drift wood out of a stream falling one foot to the mile will benefit the land several miles away? A. The water from those lands flowing down there made the necessity for increasing the size of the stream, and they should share the cost of the improvement. *157 Q. Is that the theory upon which the improvement was made ? A. It is a general benefit. The theory of the improvement is that the waters of those lands flow down and reach Bean creek ultimately; that is, a part of it.”
(Record 196.) The following appears:
“The Court: Now, why not let your record show that you offered more evidence of the same character ? If the principle for which you are contending is correct and well founded, good law, you have got evidence enough upon the subject to convince the court that the kind of order you are seeking should be made. The question is, is the principle correct? Have you performed your whole duty'in the matter of ditching as soon as you get the water off of your own land onto somebody else’s?
“Mr. Newcomer: If there is sufficient evidence to show that these people have ditched their water in natural watercourses, we are willing to rest.
“The Court: We think there is sufficient evidence of that, that you drained your land in natural watercourses. There is evidence that those watercourses have been improved, many of them, and your drainage is artificial drainage, whereby the water is cast down in greater volume and with greater speed than it would find its way naturally; it goes down on the lands below, instead of waiting to be carried away by evaporation. Now the question is, whether under such circumstances, you can avoid all expense of carrying the water to its ultimate outlet. That is the real question.”
And on Record 199, the following':
“Mr. Newcomer: The plaintiff offers to prove by this witness, Herbert H. Sharp, that this wit *158 ness personally, viewed each and every tract of land owned by plaintiff, and owned by each of the persons in whose behalf this action is brought; that he made measurements of the width and depth of the streams flowing through the several tracts of land owned by each of the persons aforesaid, and also of the elevation of .each of said tracts owned by the persons aforesaid, determining the elevation of each of said tracts respectively above the stream flowing through each of said tracts respectively, and that he would testify that said streams flow in channels from three to ten feet deep, and from six to forty feet wide, that said streams flow rapidly through the land owned by each of the persons aforesaid, that many of said streams are creeks flowing in natural channels, that the drainage of the land of each of the persons aforesaid is into said streams and creeks, that many of said creeks flow in narrow valleys or ravines, that on each side thereof there are bluffs from ten to forty feet high, that all of the lands of all of the persons aforesaid are uplands, save and except the narrow valley adjacent to said streams, that many of said farms are hilly and rolling farms, no part of which are lowlands, that a part of -said lands is sand hills, and that a part of said lands is table land; that all of said land lies from ten to fifty feet above the streams which flow through said tracts respectively, and from ten to eighty feet above high water mark on Bean creek.”
The opinion of the circuit court is reported in 10 C. C., N. S., 201, and on page 212 it is said: “Counsel, however, seem to have entertained the view that if with perfect facility the plaintiffs may discharge the water from their lands by either nat *159 ural or artificial means and if those waters can not get back to them, that then ‘they will not be benefited by any improvement below. We think that this is not a just rule nor the rule contemplated by the law. We think that if, by reason of the artificial improving of their own lands above, the plaintiffs have helped to make it necessary for the protection of the lands below to make these contemplated improvements, then they should equitably help to pay for them.”
The record shows that of the lands assessed 52 sections, or more than thirty-three thousand acres, are assessed at a uniform rate per acre, and the assessment evidently was made not according to special benefits but upon the assumption that these lands equitably ought to contribute to the cost of the improvement because the waters discharged therefrom into this stream. The plaintiff testified (Record-85) that the improvement wouldn’t hurry a single drop of water from these uplands.
The contention on the part of the plaintiff is that, “The owner of a farm may drain it by ditches which empty into natural water-courses; and he may make whatever drains are necessary for good husbandry, either open or covered, and may discharge the water therefrom into natural channels though he thereby precipitates the water more rapidly and in greater volume upon the land below.”
It is well settled under the rule of both the common and the civil law that surface water cannot be collected into a ditch and discharged upon the land of another, to his damage; but the landowner may, in the reasonable use of his land drain the water from it into its natural outlet, whether that be a watercourse or a natural drainage channel, and *160 thus increase the volume and accelerate the flow of water of such watercourse or channel, without incurring liability for damages to owners of lower lands.
Mr. Farnham in his very able work the Law on Waters and Water Rights, says, Section 889: “Having thus seen that surface water cannot be diverted from its course and cast upon neighboring property, and that the natural manner of flow cannot be materially changed to the injury of the lower owner, the question arises as to how far there is a right to have the water follow its natural channels in seeking a natural outlet, and, conversely, how far there is a right to ignore the channels and dam or fill them up at pleasure. Upon this question we find a sharp conflict in the decisions of the courts, which has resulted in the nominal adoption of two rules, which are, prima facie, diametrically opposed to each other. One is the rule of the civil law, which appears also to be the rule of the common law, and which recognizes a right to have water pass toward the streams in its natural channel, and the other is the common-enemy doctrine,' which purports to recognize a right to fight surface water at pleasure. As has been seen, there is no such rule as the latter, and its origin and scope are shrouded in mystery. As will be seen as the discussion progresses, the term is merely a general one which means little more than that there is no right to have the water flow in its natural channels. It will also be seen that the civil-law rule has been modified to some extent so as to permit a hastening of the flow of the water' toward the natural outlet, which was not originally permitted. -Therefore no arbitrary rule can be laid down which will govern all cases, but *161 each case must be dealt with upon its facts, applying the rule which will be reasonable under the circumstances, under the general rule that the water should be allowed, as far as possible, to seek its natural outlet.”
Again he says in Section 88%, after having stated the civil law rule and the common law rule: “The common and civil law, therefore, appear to be the same so far as the right to have the water follow its natural course is concerned. As will be seen in the succeeding section, a rule has been stated as the antithesis of the civil-law rule that surface water is a common enemy which may be fought at pleasure. And, because it was the antithesis of the civil-law rule, some courts, without investigation, have announced that it was the common-law rule.”
In Gibbs v. Williams et al., 25 Kans., 214, Brewer, J., now Mr. Justice Brewer, states the common law rule as follows: “Now the ordinary rule concerning surface-water is settled and familiar; the lower estate owes no duty to the higher, and the owner of each may use or abandon surface-water as he please. Tt is not one of the legal rights appertaining to land, that the water falling upon it from the clouds shall be discharged over land contiguous to it; and this is the law, no matter what the conformation of the face of the country may be, and altogether without reference to the fact that in the natural condition of things the surface-water would escape in any given direction; the consequence is, therefore, - that there is no such thing known to the law as a right to any particular flow of surface-water, jure naturae. The owner of land may at his pleasure withhold the water falling on *162 his property from passing on to that of his neighbors, and in the same manner may prevent the water falling on the land of the latter from coming upon his own. In a word, neither the right to discharge nor to receive surface-water can have any legal existence except from a grant, express or implied. The wisdom of this doctrine will be apparent to all minds on a little reflection. If the right to run in its natural channels was annexed to surface-water as a legal incident, the difficulties would be infinite indeed. Unless the land should be left idle, it would be impossible to enforce the right in its rigor; for it is obvious every house that is built and every furrow that is made in a field, is a disturbance of such right. If srich a doctrine prevailed, every acclivity would be and remain a watershed, and most low ground become reservoirs. It is certain that any other doctrine but that which the law has adopted would be altogether impracticable.’ ”
However, in the' second paragraph of the syllabus of that case the rule is stated as follows: “In order to create the exception noticed in Palmer v. Waddell, 22 Kans., 352, it is not sufficient that the conformation of the surface be such that the water falling on a large tract of land naturally flows Upon and over a depression at one end of that tract; there must' be a necessity for the outflow over this depression in order to prevent the flooding of a considerable body of land, and there must be a distinct channel, with well-defined banks, cut through ’ the turf and into the soil by the flowing of the water; the bed of a stream, or something which will present on casual glance to every eye the unmis *163 takable evidences of the frequent action of running water.”
In Kauffman v. Griesemer, 26 Pa. St., 407, which was an action to recover damages for obstructing a watercourse and throwing the water back on the plaintiff’s land, Woodward, J., says: “Almost the whole law of watercourses is founded on the maxim of the common law, aqua currit et debet currere. Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenement for the discharge of all waters which by nature rise in-or flow or fall upon the superior. Hence the owner of a mill has an easement in the land below for the free passage of the water from the mill, in the natural channel of the stream, accompanied with a right to enter upon the land for the purpose of clearing out the stream, and removing obstructions to the free flow of the water: Prescott v. Williams, 5 Met. (Mass.), 429.
“This easement is called a servitude in the Roman law, and consists, says Pardessus, in the subjection of the inferior heritage towards those whose lands are more elevated to receive the waters which flow from them naturally, and quoting the Code Civil, he adds, 'this obligation applies only to waters which flow naturally, without any act of man;’ those which come either from springs, or from rain falling directly on the heritage, or even by the effect of the natural disposition of the places, are the only ones to which this expression of the law can be applied. It is not however to be understood, he goes on still further to say, that because the flow of water must not be caused by the act of man, that therefore the proprietor who transmits water *164 to the inferior heritage, is not permitted to do anything on his own land — that he is condemned to abandon it to perpetual sterility, or never vary the course of cultivation, simply because such acts would produce some change in the manner of discharging the water. The law intends not this; it prohibits only the immission into the inferior heritage of the waters which would never have fallen there by the disposition of the places alone. It neither would nor could refuse to the superior proprietor the right to aid and direct the natural flow.
“Hence, for the sake of agriculture — agri colendi causa — a man may drain his ground which is too moist, and discharging the water according to its natural channel, may cover up and conceal the drains through his lands — may use running streams to irrigate hi's fields, though he thereby diminishes, not unreasonably, the supply of his neighbor below —and may clear out impediments in the natural channel of his streams, though the flow of water upon his neighbor be thereby increased. * * *
“It is not more agreeable to the laws of nature that water should descend than it is that lands should be farmed and mined; but in many cases they cannot be if an increased volume of water may not be discharged through natural channels and outlets. The principle, therefore, is to be maintained; but it should be prudently applied. This court refused to apply it as among several owners of city lots, each of whom, it was held in Bentz v. Armstrong, 8 W. & Ser., 40, must so regulate and grade his own lot as that the water which falls or accumulates upon it shall not run upon the lot of his neighbor. It was greatly misapplied by the plaintiffs when they supposed they might not only *165 increase the ordinary flow, but might dig a new channel for it to and into the defendant’s land. If, from the natural disposition of the place, a basin was formed on the plaintiffs’ land, some 17 rods short of the defendant’s, from which the water flowed upon the defendant only in time of floods or freshets, the defendant was the superior owner in respect of that place in all ordinary times, and it would be a reversal of the principles stated to subject him, ag'ainst his consent, to an artificial channel that would deprive him of the advantages of his position. If his land was higher than that basin, he had a right, except in high water, to have the rains and snows run from his land on to the plaintiffs’. Aqua currit et debet currare.
“The plaintiffs had no right to insist upon his receiving waters which nature never appointed to flow there; and against any contrivance to reverse the order of nature he might peaceably and on his own land take measures of protection.”
Martin v. Riddle, 26 Pa. St., 415, is an action for obstructing a watercourse. There was on the defendant’s land a natural channel through which the- falling water and some living springs were naturally discharged from the land of the plaintiff and others. There had been for a long time a culvert underneath the road which separated the lands of the plaintiff and defendant, through which the natural flow had been discharged across the road into the channel aforesaid. This had gotten choked up from neglect, and the authorities had built a hew culvert in its place. After this the amount of water flowing through said channel was greatly increased in time of storms by means of a road cut into the hill by an adjoining proprietor, a cemetery com *166 pany, which collected into one drain, and thence into this channel, large quantities of water which had been previously discharged in a natural way over a large surface. This increase of water did great injury to the defendant, and to protect himself therefrom, he stopped up the culvert, and thus threw the water back upon the road, on the plaintiff’s side of it, overflowed his land, and interfered with his garden operations. It appeared also that the plaintiff had constructed several underground drains through his land, which discharged springs and the drainage of his land at the point where the injury occurred.
The case went to the supreme court on error to the charge of the court to the jury. The judgment was affirmed. The charge was as follows, Lowrie, J.: “I presume that' this contest is not so much for the amount of damages which you may give by your verdict,, as to settle a question of right. If the defendant has wrongfully flooded the plaintiff’s land, this alone is an injury for which the plaintiff is entitled to at least nominal damages. You can allow beyond that, in proportion to the injury proved. If it was done maliciously, you can allow exemplary damages; though, I presume, you will most likely consider the defendant’s act as an honest, even if mistaken, assertion of his right.
“The question of the rights of the parties is a very interesting one, but not at all difficult of determination; for it is governed by principles which recommend themselves to the common sense of every man.
“The right which every man has to the reasonable use of the running streams passing through his land, for irrigation, watering cattle, driving ma *167 chinery, and for other domestic, agricultural, and manufacturing purposes, is well understood, and, on account of its correspondence with the indications of nature, is seldom disputed in its principles. It is a right, in the enjoyment of which a reasonable regard must always be had to the rights of others. On the other hand — as are our rights, so are our duties. We claim the use of running waters according to the order of nature where it is for our benefit, and the same order requires us to bear the inconvenience of them when they are injurious.
“It is therefore conceded that the living springs issuing from the hill shall flow in the channel to which the nature of the ground throws them. If the defendant has, by the erection of any obstruction, thrown them back upon the plaintiff to his injury, the latter has a right to recover; and the defendant cannot excuse himself on the ground that the owners above him have increased the flow of water to that point so as to make it injurious to him. He cannot, by stopping the channel, visit their sins upon the plaintiff. For the injury done to him by others he must seek redress against them: Corp. Jur. Civ. Dig. 39, 3, 1, 18. If you are not able to say whether the injury arose from the act of the plaintiff in giving his drains an improper direction, or from the wrongful act of the defendant, of course you will find for the defendant.
“I shall speak now of the general principles of the law in the matter of rain water and drainage, and of the respective rights and duties of adjoining proprietors in relation thereto. They are in general the same as in the case of running water — they follow nature. Not readily finding the subject *168 treated of in any of our usual books of reference, I venture to extract the law from books of a foreign origin — Corp. Jur. Civ. 39, 3, 1, and 43, 21; Code Nap. Sec. 640; Poth. du Voisinage. It is so simple in its character that we are little likely to be led astray by any modification of it arising from peculiar institutions.
“Where two fields adjoin, and one is lower than the other, the lower must necessarily be subject to all the natural flow of water from the upper one. The inconvenience arises from its position, and is usually more than compensated by other circumstances. Hence the owner of the lower ground has no right to erect embankments whereby the natural flow of the water from the upper ground shall be stopped; nor has the owner of the upper ground a right to make any excavations or drains by which the flow of water is directed from its natural channel and a new channel made on the lower ground; nor can he collect into one channel waters usually flowing off into his neighbor’s fields by several channels, and thus increase the wash upon the lower fields.
“But he may, and good husbandry sometimes requires that he should, cover up and conceal the drains through his own land, keeping the place of discharge unchanged. And as he may use running streams to irrigate his lands, even though he does thereby, not unreasonably, diminish the supply of his neighbor, so also he may use proper means of draining his ground where it is too moist, and discharge the water according to the natural channel, even though the flow of water upon his neighbor be thereby somewhat increased.
*169 “If it be difficult to ascertain from the character of the surface what is the natural channel, then the course which the water has long been peaceably and openly permitted to run will be considered as having had a legitimate origin; for vetustas vicem legis tenet. If the owner of the upper ground wrongfully direct an unnatural quantity of water upon the ground of a lower neighbor, by collecting several streams together and discharging them at one place, or by any other means, the neighbor below may have an action against him; but he cannot justify the erection of an embankment to stop the water, if thereby the water is improperly forced upon another owner.”
Miller v. Laubach, 47 Pa. St., 154, is an action to recover damages for injury occasioned by the construction of a drain whereby surface water was conducted from springs on the defendant’s land onto, the land of the plaintiff. There was wet or marshy ground on the defendant’s land, occasioned by winter springs, which only saturated the earth by -running off without a defined channel. To remedy this the defendant constructed the drain through the land thus saturated to the plaintiff’s land and there discharged the water which was accustomed to remain on his oavii, until carried off by evaporation, and this rendered a part of plaintiff’s land wet and worthless. Kauffman v. Griesemer, supra, was approved and followed, and it is held: “The owner of land through which a stream flows may increase the volume of water therein by draining into it, without liability for damages to a lower owner; but he cannot,.by an artificial channel, drain water standing upon his own land upon that of another.”
*170 These cases were followed in Hays v. Hinkleman, 68 Pa. St., 324, and in Rhoads v. Davidheiser, 133 Pa. St., 226, where it is held: “The diversion by a landowner of surface water, collecting on his land from rain and melting snow, out of the course which nature has provided for it, in such way as to cause it to flow upon the land of another where it has not flowed before, is an actionable trespass. An owner, in improving' his land for agricultural purposes, may increase the flow of surface water in its natural channel, but he will be responsible for any damage resulting from his creating a new channel therefor which discharges it upon an adjoining owner.”
In Meixell, Appellant, v. Morgan, 149 Pa. St., 415, in an opinion by Mr. Chief Justice Paxson, it is held: “The owner of land on a higher level has a right to lay artificial drains on his land to carry off the ordinary rain fall and discharge of water at one point upon the land of his neighbor on a lower level, where that point is the natural watershed for both tracts, and there is an open ditch on the lower land into which the waters from the higher land naturally descend, provided the water from the drains does not materially increase the flow of water upon the land of the lower owner and work injury to him. The flow of water from a dominant to a servient tenement may be increased in the drainage of land, whether on the surface or underground, but care must be taken in doing so not- to cause an unnecessary injury, and the water must not be diverted from its natural channel by the opening of new or different channels.”
In Anderson v. Henderson, 124 Ill., 164, it is held: “The owner of a higher tract of land has the *171 right to have the surface water falling or coming naturally upon his premises by rains or melting snow, pass off the same, through the natural drains, upon or over the lower or servient lands next adjoining, and the owner of the dominant heritage has, and ought to have, the right, by ditches and drains, to drain his own land into the natural and usual channels which riature has provided, even if the quantity of water in that way thrown upon the next adjoining lower lands be thereby increased. ■While the owner of lower lands shall receive all water that naturally flows from the next higher lands, the owner of the higher lands may not open or remove natural barriers, and let on such lower lands water that would not otherwise naturally flow in that direction.”
In Mizzell v. McGowan, 120 N. Car., 134, the facts were as follows: Broad creek, about thirty -or forty feet wide at its mouth, emptied into Tar river, Moyes run into Broad creek, and three swamps naturally emptied into Moyes run; plaintiff’s farm was bounded on the east and north by Broad creek and Moyes run; prior to the cutting of the canal complained of the waters of Moyes run never overflowed plaintiff’s land, but since then they have, in ordinary rains, overflowed and damaged plaintiff’s lands; ill high freshets the waters of Tar river backed up and overflowed plaintiff’s land, before and since the cutting of the canal; Moyes run and Broad creek were natural watercourses; Moyes run was a swamp two or three hundred yards wide, with a well defined watercourse running through it and emptied into Broad creek; the waters on the upper swamp lands, owned by the defendants, naturally flowed into Moyes run, *172 and some of the defendants cut the canal for clearing and cultivating said lands, and had cleared and were cultivating the same and had used said canal for the purpose of draining the surface waters from their lands into Moyes run. Prior to cutting.the canal Baldwin swamp was a natural depression or swale two hundred or three hundred yards wide through which was no watercourse through which the surface waters flowing from said lands naturally drained into Moyes run, and the swamp through which the canal was cut was a natural drainway and drained into Moyes run. The nature of the other swamps was the same as that of Baldwin swamp. It was held: “The privilege or easement of the upper tenant to carry off the surface water in its natural course, under reasonable limitations, and the subserviency of the lower tenant to this easement, are' the natural incidents to the ownership of land. The owners of swamps, whose, waters naturally flow into natural watercourses, can make such canals as are necessary to drain them of the water naturally flowing therein, although in doing so the flow of water in the natural watercourse is increased and accelerated so that the water is discharged on the land of an abutting owner.”
In the opinion, Faircloth, C. J., says: “The defendants asked the court to charge the jury that if they find from the evidence that Broad creek and Moyes run are natural watercourses and that the waters of the upper swamps naturally flow therein, and were susceptible of drainage for agricultural purposes, then the defendant had a right to make such canals in these swamps as were necessary to drain them of the water naturally falling thereon, *173 although in so doing the flow of water in Moyes run was thereby increased and accelerated, and the flow of water was increased on the plaintiff's land. This prayer embraces the substance of all the prayers. His Honor modified the prayer by saying ‘provided he does not thereby damage said land.' Defendant excepted. We think his Honor should have given the defendant's prayer in substance without the proviso. * * * This question has been much discussed in many courts. The surface of the earth is naturally uneven, with inequality of elevation. The upper and lower holdings are taken with a knowledge of these natural conditions, and the privilege or easement of the upper tenant to carry off the surface water in its natural course, under reasonable limitations, and the subserviency of the lower tenant to this easement are'the natural incidents to the ownership of the soil. The lower surface is doomed by nature to bear this servitude to the superior and must receive the 'water that falls on and flows from the latter. The servient tenant cannot complain of this, because aqua currit et debet currere ut solebat.”
The same case was again before the court, Mizzell v. McGowan, 125 N. Car., 439. In the second trial there was a verdict for the defendant. The case was reversed in the supreme court for error in the charge. The supreme court found that the case had been tried upon the theory that the defendant had the right to divert water into these streams if she had carried away from the streams by cutting a ditch as much water as she diverted to them from the swamps. In the opinion it is said: “It is now well settled that neither a corporation nor an individual can divert water from its natural *174 course so as to damage another. They may increase and accelerate, but not divert. We must stand by the rule thus laid down, but cannot extend its application. In itself it frequently works a necessary hardship, as naturally much of the water that falls in a swamp remains there or is carried off by evaporation, while the remainder flows off so slowly as generally not to overtax the natural outlets. While giving to the owner of the higher land the full benefit of his natural easement, we cannot permit him to go beyond it under the plea that he or somebody else has cut an independent ditch somewhere else that is supposed to counterbalance the injury he has done by the unlawful diversion of water. To do so would destroy the principle itself, and open up an endless series of defenses confusing in their tendencies and largely speculative in their nature.” The case was' again tried and again resulted in a verdict for the defendant, Mizzell v. McGowan, 129 N. Car., 93, and it was there held: “No one has a right to divert water from its natural course so as to damage another, though he may' increase and accelerate it. A man can dig ditches wherever he pleases upon his own land, provided he runs them into a natural watercourse before leaving it, subject only to the limitation against diversion.” And in the opinion, Douglas, J., says: “We are aware that great hardship may sometimes occur from the unlimited right of increase and acceleration, and that there are some authorities limiting it to the capacity of the natural outlet; but we must adhere to the rule as the result of our deliberate judgment. However short it may fall as a theoretical definition of ideal right, we can frame none better that is capable of practical application.
*175 “Its limits are clearly defined by the natural landmark of the watershed, which, seen of all men, renders it easy of application and capable of definite proof. Any other.rule would prevent the drainage of large bodies of swamp lands of great natural fertility and capable of the highest degree of improvement, but now worse than useless. They will eventually be needed to support an ever-increasing population, and to shut them up indefinitely as the mere homes of disease is repugnant to the highest principles of public policy and of private right. Suppose the natural capacity of the watercourse was made the test of the rule; it would be so extremely difficult of application as practically to destroy its value. What is the natural capacity of a stream? Is it measured at low water or at high water ? Almost any stream can carry off whatever water may be made to flow into it in dry weather, or perhaps even in ordinary times. On the contrary, the clearing up of our lands is having the double effect of greatly accelerating the flow of water and at the same time filling up our streams with sand, so that very few of them can now carry the water naturally flowing into them after heavy rains.
“Again, suppose the upper tenant were compelled to regard the natural capacity of the stream, how far down would this limitation extend? Naturally, many others would drain into the same stream, so that the landowner near its mouth would get the accumulated waters of all those above him. In case of injury, how would he apportion his damages, and where would the liability of each tortfeasor begin and end? These questions, it seems to us, would severely tax the utmost ingenuity of *176 the courts, and leave the jury in such a state of perplexity as to seriously endanger their intelligent determination of the issues
“It is contended by the defendant that chapter 30 of the code should, be taken as determining this case. ' We do not th.ink so. Those sections by their very terms apply to artificial outlets, such as ditches and canals, and not to natural watercourses. A man can dig ditches wherever he pleases upon his own land, provided he runs them into a natural watercourse before leaving his own land, subject only to the limitation against diversion. But if he cannot reach a natural watercourse without going into the lands of another, he must proceed under chapter 30 of the code. The scope of this chapter is indicated in section 1297, which is in part as follows: An}'- person owning pccoson, swamp or •flat lands, or owning lowlands subject to inundation, which cannot be conveniently drained or embanked so as to drain off or dam out the water from such lands, except by cutting a canal or ditch, or erecting a dam through or upon the lands of other persons, may, by petition, apply to the superior court of the county,’ etc.
“In the case at bar the defendant has not cut any ditch upon the lands of- the plaintiff, nor does she wish to do so. She has simply, by means of her own ditches, turned into a natural watercourse upon her own land increased and accelerated but undiverted waters. The rules governing natural and artificial watercourses as outlets through the lands of another are essentially different — this opinion dealing exclusively with the former.”-
In Farnham on Waters and Water Rights, Section 889d, it is said: “The question of the right to *177 obstruct a natural drainage channel has been needlessly complicated with the further question whether or not a watercourse existed. The rules with respect to watercourses form a distinct class by themselves, and were formulated to conserve the interests of the riparian owners. On the other hand, the question of drainage involves, not only the welfare of the individual landowner, but also that of the community in so far as its healthfulness and prosperity depend upon relieving land of stagnant water and improving its productiveness. Before man owned any parcel of land nature had impressed upon it certain characteristics. So far as these can be changed without interfering with the use or enjoyment of neighboring property, they may'be changed at will. But, so far as one parcel has been subjected by nature to a servitude in favor of„ an adjoining parcel, the enjoyment of which will be materially injured -by destroying the servitude, it would seem that the rule by which a purchaser of property is bound by its condition when he acquires title would prevent the destruction of such servitude. In order to be within the operation of this rule, the servitude must be clearly and permanently impressed upon the property so as to be plainly visible to the intending purchaser. Under this rule, the great weight of authority is in favor of the proposition that a lower proprietor cannot place any obstruction in an obvious ‘drainage channel which has been formed by nature and carries the water from a higher to a lower estate. Some courts have reached the same result by holding that channels formed by surface water might be watercourses, and have applied to them the rule governing the obstruction of such courses, and in some *178 cases there is no doubt that channels which now carry merely surface water were once living streams. When the country was covered with forest so that the ground was more nearly saturated with water, springs came to the surface and fed streams which flowed more or less constantly down these channels; but, as the land was cleared, and brought under cultivation, the springs gradually lost their strength, and finally disappeared so that the channels which formerly carried the streams flowing from them now receive only the water which comes from surface drainage. But there is no reason why, if the rule of watercourses rather than that of drainage is to be applied, it should not be applied to this class of channels. That these drainage channels cannot be obstructed is supported by the great weight of authority/'' Many cases in many states are there cited, and he then says: “To reach their conclusions, some of the courts above named have attempted to show that the channels in which the water was running were watercourses, but they were not watercourses within the rule governing riparian rights; and the attempt to demonstrate the existence of a watercourse was made necessary by the disastrous effects which would attend the opposite holding. In fact, when surface water has united to form a stream the effect of damming it back is temporarily as bad as the damming back of a watercourse, and the similarity in the effect absoutely demands the application of the same rule to each. And, in order to do so, the courts which have not perceived the full meaning of the civil-law rule as to drainage have attempted the makeshift of bringing the particular stream within the rule governing • the stoppage of watercourses' *179 by showing that they were in fact such, whereas the only similarity was in the result of stopping a present flow.”
The learned author then, after having noticed a number of cases in which he points out wherein they have misapprehended the common-law rule, says: “This conflict in opinion arises in most cases out of a failure to understand the civil-law rule, and in attempting to determine drainage rights by the rules applicable to watercourses. As has been seen, the civil-law rule is merely that when the water has its course regulated from one ground to another,— that is, when it has taken a definite course in a definite 'channel, — it cannot be stopped upi Practically all the courts, except the supreme court of the United States and the courts of Indiana, New York, Missouri, Wisconsin, and the lower courts of New Jersey, agree in this rule, but, in applying it, they differ somewhat in their conclusions, the difference depending largely upon how • far each court has embraced the idea that a watercourse must in fact exist before the rule can be applied. As will be seen in the succeeding sections, there is no right anywhere to the continued flow of water which has not taken a definite course, but which spreads out over the surface of the ground. And, if the courts would recognize the fact that the right to the flow of the water which has taken a definite course is a rule of drainage, and not of watercourses, most of the difficulty which they have experienced would disappear. The rule of drainage applies if the water has taken a definite course, although the flow is not strong enough to cut the sod or form a trench in the soil; it is enough that a natural depression forms a channel for the stream.”
*180 In a monographic note to Mizzell v. McGowan, 129 N. Car., 93, (85 Am. St. Rep., 705), Judge Freeman cites many cases supporting the propositions as above stated, and on page 734 says: “While the right to greatly increase the volume and accelerate the flow of a stream by draining into it large quantities of surface water is recognized, it seems not to be clear whether such a right prevails, when the natural drainage channel. is not a stream or watercourse, but is, nevertheless, a well-defined channel.” And at the bottom of the same page he states his own conclusion from the authorities, as follows: “We believe that a landowner should be permitted to make use of a natural drainage channel, running through his land, and over that of another, although the flow of surface water is greatly accelerated, and its volume increased, if such use is a reasonable one, even if the channel is not technically a watercourse.” As a matter of precaution, it may be proper to call attention to the fact that the rule is not always applied in the case of city lots, Farnham, Section 889c, and that the rule respecting the flow of surface water does not apply to the overflow of rivers. Crawford v. Rambo, 44 Ohio St., 279.
Many cases are cited by Mr. Farnham and by Judge Freeman in support of their conclusion. The law in this state is in harmony with the cases that have been quoted from at such length, and they have been quoted from at such great length only because of the importance of the question presented and because of the seeming difficulty many times in applying the- law to the facts.
Blue et al. v. Wentz et al., 54 Ohio St., 247, decided in 1896 was an action to enjoin the collection *181 of assessments for the construction of a ditch. It was held: 1. “Where the lands of an owner, by-reason of their situation, are provided with sufficient natural drainage, they are not liable for the costs and expense of a ditch necessary for the drainage of other lands, simply for the reason that the surface water c-f his lands naturally drain therefrom to and upon the lands requiring artificial drainage. 2. A lower tenement is under a natural servitude to a higher one to receive from it all the surface water, accumulating from falling rains and melting snows, or from natural springs, that naturally flow from it to and upon the lower one. This advantage of the higher tenement is a part of the property of the owner in it, and he is not indebted to the lower tenement therefor. 3. In making an assessment on lands, benefited by artificial drainage, the extent of their watershed is not the proper rule, but the amount of surface water for which artificial drainage is required to make them cultivable, and the benefits that will accrue to the lands from such drainage. However much water may fall on them or arise from natural springs, if, by reason of their situation, they have adequate natural drainage therefor, they are not liable for the cost of artificial drainage to other lands.” In the opinion, by Minshall, J., it is said: “An assessment on lands presupposes some special benefit to the lands to be assessed, derived from the improvement for which the assessment is made. When, in the nature of things, there can be no special benefit to the lands from the proposed improvement, an assessment made on them for any part of the cost of the improvement, would be a simple taking of the property of one person for the'benefit of another; *182 and the -assessment would be void. * * * It is a principle of property well recognized in many of the states, and particularly in Ohio, that, where lands are situated as above supposed, the lower tenement is under what is called a natural servitude to receive such waters as flow to and upon it from a higher one, provided the industry of man has not been used to create the servitude. The right which the higher tenement has to require the lower one to receive from it the surface water that naturally drains to and upon it, is a right incident to the higher tenement, and a part of the property of the owner in it. * * * It is then apparent that the proposed assessments upon the lands of the plaintiffs in this case cannot be sustained. To do so would be to compel the plaintiffs to pay for that which they possess as a part of their property in their lands- — the right to require the lands on and along the swale to be servient to their lands for the purpose of surface and other natural drainage; and for the enjoyment of this right, incident to their lands, they cannot be assessed.”
After the above decision the general assembly, in April, 1900, incorporated the principle there announced in the Revised Statutes. Section 4448, Revised Statutes (Title VI, Drainage), was amended by adding thereto the following: “The words ‘according to the benefits’ used in this chapter in directing boards of county commissioners to assess lands for ditches and in directing engineers to report assessments for the same shall not be held to authorize any assessments for benefits conferred upon lands by nature nor the right of easement of the owners of superincumbent lands to pass the water therefrom through natural watercourses.” *183 The decision of the circuit court is contrary to both Blue et al. v. Wentz et al., supra, and the statute.
There is no finding of facts so that judgment on the merits cannot be entered here, and the judgment is reversed and the cause remanded to the circuit court for further proceeding.

Reversed.

Crew, C- J., Spear, Davis and Shauck, JJ., concur.